FILED

2024 Aug-30 PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **Alaska Air Group, Inc.,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **Anthem, Inc.,** *et al.*, <br><br> **Defendants.** | **Case No. 2:21-cv-01209-RDP** |
| **JetBlue Airways Corporation,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **Anthem, Inc.,** *et al.*, <br><br> **Defendants.** | **Case No. 2:22-cv-00558-RDP** |
| **Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc.** *et al.*, <br><br> **Plaintiffs** <br><br> **v.** <br><br> **Anthem, Inc.** *et al.*, <br><br> **Defendants.** | **Case No. 2:22-cv-01256-RDP** |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF NON-BLUE CLAIMS DATA

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

RELEVANT BACKGROUND .........................................................................................3

LEGAL STANDARD........................................................................................................5

ARGUMENT .....................................................................................................................6

    I.      Defendants' Belated Claims of Relevance and Necessity Are Not Tethered to Plaintiffs' Actual Claims or Any Legitimate Defense ................................... 6

    II.    Defendants Already Have Proportionate Discovery Concerning Non-Blue Competition........................................................................................................10

    III.   Production of Non-Blue Claims Data Will Be Burdensome and Derail The Case .....11

    IV.   Plaintiffs Generally Do Not Have Access to Claims Data, And What They May Be Able To Obtain Is Limited ...........................................................................12

CONCLUSION.................................................................................................................14

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                   **Page(s)**

*Ala. Aircraft Indus., Inc. v. Boeing Co.,*
  No. 2:11-CV-3577-RDP, 2015 WL 13622487 (N.D. Ala. Jan. 26, 2015) ...............................5

*City of Pittsburgh v. W. Penn Power Comp.*,
  147 F.3d 256 (3d Cir. 1998)........................................................................................................8

*Gremillion v. Stantec Consulting Servs. Inc.,*
  No. 3:23MC13-MCR-HTC, 2023 WL 4417266 (N.D. Fla. July 5, 2023) ............................11

*Herbert v. Lando*,
  441 U.S. 153, 99 S. Ct. 1635 (1979).........................................................................................6

*In re Delta Dental Antitrust Litig.*,
  No. 19 CV 6734, 2023 WL 8043400 (N.D. Ill. July 18, 2023) ..............................................10

*In re Elec. Books Antitrust Litig.*,
  No. 11 MD 2293 DLC, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)....................................8

*L.A. Mem. Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ...................................................................................................8

*Liese v. Indian River Cnty. Hosp. Dist.*,
  701 F.3d 334 (11th Cir. 2012) ...................................................................................................5

*Nat'l Soc. of Pro. Engineers v. United States*,
  435 U.S. 679, 98 S. Ct. 1355 (1978).........................................................................................7

*NCAA v. Board of Regents of University of Oklahoma*,
  468 U.S. 85, 104 S. Ct. 2948 (1984).........................................................................................8

*Ohio v. American Express Co.*,
  585 U.S. 529, 138 S. Ct. 2274 (2018)......................................................................................10

*Runton ex rel. Adult Advoc. & Representation v. Brookdale Senior Living, Inc.*,
  No. 17-60664-CIV, 2018 WL 1083493 (S.D. Fla. Feb. 27, 2018) ...........................................5

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594, 73 S. Ct. 872 (1953)...........................................................................................8

*U.S. v. Topco Assoc., Inc.*,
  405 U.S. 596, 92 S. Ct. 1126 (1972).........................................................................................8

**Statutes and Rules**                                                                                         **Page(s)**

Fed. R. Civ. P. 26(b)(1).............................................................................................................5

Fed. R. Civ. P. 26 Advisory Committee's Note.....................................................................5

Fed. R. Civ. P. 34(b)(1)(A).......................................................................................................5

iii

## INTRODUCTION

Defendants' Motion confirms that non-Blue claims data is not proportional to the needs of this case. Defendants assert that they want to know what Plaintiffs pay non-Blues for "ASO coverage." They have received and continue to receive all such information, including non-Blue contracts, consultant presentations concerning non-Blue bids, and data in response to Defendants' RFP 24: "Documents sufficient to show all monthly payments, including premiums or premium equivalents, Administrative Service Fees, or other charges or amounts, You or a Participant made to any Commercial Health Insurer or Third-Party Administrator."[1] Defendants seek information about ASO competition and documents concerning "but-for-world" competition. The Motion attaches example documents that Plaintiffs have already produced addressing those matters—and they are but the tip of the iceberg of what Plaintiffs have produced and continue to produce. To be clear, non-Blue reimbursement rates are not relevant to Plaintiffs' claims of injury, damages, or harm to competition here because the anticompetitive conduct at issue is Defendants' conspiracy *that prevented competition between and among Defendants*. Nevertheless, Defendants have received and will continue to receive abundant documents concerning non-Blue competition and pricing. The demand for transaction level, non-Blue medical claims data is a disproportionate bridge too far.

Although never acknowledged in their Motion, Defendants took this very position— repeatedly—for nearly a year. Defendants challenged Plaintiffs to explain why *Blue* claims data was necessary for the case and made clear that producing such data is a costly, burdensome and time-consuming endeavor. Defendants now assert that non-Blue claims data is "necessary,"

---

[1] (*BBB* ECF 359-12 at 26.) For ease of reference, Plaintiffs cite the ECF docket entries for filings from the *Bed Bath & Beyond* matter, but identical filings were made in each of the three above-captioned cases.

"fundamental," and "plainly relevant" to this case. Defendants' delay in turning over their own medical claims data long ago belies their hollow conclusions. Defendants themselves challenged the need and utility for such granular data, and it is too late for Defendants' claims of necessity. There is no time for a costly and time-consuming chase for this granular data.

Compelling production of non-Blue claims data will inevitably result in further delay of key case deadlines. Most all Plaintiffs do not possess this data and for the minority of Plaintiffs who used a non-Blue, they have limited, if any, rights to access and produce the granular claims data demanded by Defendants. Even if such data could somehow be produced, questions abound concerning what would be produced, the completeness and meaning of the data fields, its suitability for any purported comparison "modeling" Defendants seek to undertake, and their usability at trial. Plaintiffs and Defendants discussed the contours of Defendants' production of granular Blue claims data for nearly a year and questions still remain concerning its sufficiency. Moreover, *none of the Blue claims data has been produced yet*. Defendants recently advised that they do not expect to make any production of claims data until mid-September, which falls after the July 16, 2024 deadline Defendants committed to for the production of financial structured data. It also falls well after the August 13, 2024 deadline to which Defendants committed to produce membership structured data. Indeed, none of that other data have been produced by Defendants, despite their knowledge that such deadlines—including a September 12, 2024 substantial completion deadline for all documents and data—constitutes the minimum lead time necessary for Plaintiffs' experts. There is no time to start another year-long dialogue with non-parties all over again, and there is there is no reason to do so given the lack of relevance of non-Blue claims data to Plaintiffs' claims or Defendants' defenses.

Granular, transaction-level medical claims data presents a costly and time-consuming logistical problem. Defendants have already received and continue to receive the discovery that they reasonably need to advance their purported defenses. The discovery is not proportional to the needs of the case, particularly when its purpose is to accommodate Defendants' change of heart concerning its necessity and importance. The Court should deny Defendants' Motion.

## RELEVANT BACKGROUND

Plaintiffs respectfully refer the Court to Plaintiffs' August 16 Motion for a Protective Order (*BBB* ECF 359) for key background matters relevant to Defendants' Motion to Compel. Plaintiffs summarize the timeline of significant events below.

- <u>March 24, 2023</u>: Defendants object to the production of their own granular medical claims data. Defendants offer to meet and confer with Plaintiffs regarding their request. (*BBB* ECF 359-2 at RFPs 12, 13, 14.)

- <u>July 17, 2023</u>: Defendants challenge the need for granular medical claims data: "***Defendants need more information about why Plaintiffs believe claims data of this magnitude and granularity is needed***. This Data Request calls for an enormous amount of granular data for individual claims, but ***it is not clear why granular claims data is needed or relevant to Plaintiffs' theories of liability or damages, which Plaintiffs recently characterized as based on purported overcharges for ASO fees***." (*BBB* ECF 359-3 at 2 (emphasis added).)

- <u>August 2023-January 26, 2024</u>: Notwithstanding Defendants' questioning of the relevance of claims data, the parties discuss the contours of the potential production of granular Blue claims data, with Plaintiffs raising concerns about the sufficiency of the production and fields by Defendants. During those discussions, Defendants never advised that they believed claims data was relevant or necessary to the case or that they intended to use it. (*BBB* ECF 359-5.)

- <u>March 1, 2024</u>: Defendants produce their MDL expert reports pursuant to the Court's January 30, 2024 Order. These reports obviated Plaintiffs' request for Defendants' structured claims data. (*BBB* ECF 359-9; *id.* 359-10.)

- <u>March 26, 2024</u>: During a March 26, 2024 conference with the Court-appointed Neutral Mr. Gentle, Defendants argue that they are entitled to non-Blue claim data because Plaintiffs were seeking Blue claims data from them. (*See BBB* ECF 359-20.)

3

- <u>April 2, 2024</u>:  Plaintiffs propose that both sides forego medical claims data, citing cost, expense, and the newly disclosed expert reports from the MDL.  (*BBB* ECF 359-11.)

- <u>May 30, 2024</u>:  Defendants submit a letter to Court-appointed Neutral Gentle, responding to Plaintiffs' April 2, 2024 proposal.  Defendants reject the proposal and explain, for the first time, their intended use of non-Blue granular claims data.  (*BBB* ECF 359-7.)

  Defendants also advise that they are in the process of preparing Blue claims data for production, but questions concerning the sufficiency of that production remain outstanding.  (*BBB* ECF 359-6.)  As of August 30, 2024, Defendants have still not produced any Blue claims data.  (Ex. U.)

On August 14, 2024, the parties conferred concerning Plaintiffs' outstanding questions about the Blue claims data fields that Defendants intend to produce.  Plaintiffs inquired about how to identify within the data fields the amounts actually paid to providers for services rendered to Plaintiffs.  Defendants could not answer this question.  Defendants directed Plaintiffs to re-read the definitions in Defendants' data dictionaries or take a deposition to aid in determining the answer.  Plaintiffs also asked Defendants to, among other things, identify all of the data fields (among the several hundred being produced) that related to the timeliness of claim processing. Defendants again directed Plaintiffs to re-read the definitions in Defendants' data dictionaries or take a deposition to aid in determining the answer.  (Ex. V (Briody Decl.) ¶ 8.)  Defendants later sent Plaintiffs correspondence that still did not answer Plaintiffs' questions.  (Ex. U.)  These are significant matters that need to be resolved in their own right.  It is essential for Plaintiffs to understand what *Blue* data Defendants are producing in order to assess whether the presentation is fair, and whether the data can be used to perform the kinds of analyses that Defendants assert that they intend to do.  But even putting questions regarding Defendants' unilateral decisions about the scope of their claims data productions aside, the entire dialogue foretells the challenging and time-consuming exercise of obtaining such answers from non-party, non-Blue insurers.

Plaintiffs have been and continue to produce documents concerning competition from non-Blue insurers, including non-Blue contracts, consultant presentations, and presentations concerning Blue RFP bids. (*E.g.,* Exs. W, X, Y, Z.) Plaintiffs also have agreed to produce (and have produced) data in response to Defendants' RFP 24: "Documents sufficient to show all monthly payments, including premiums or premium equivalents, Administrative Service Fees, or other charges or amounts, You or a Participant made to any Commercial Health Insurer or Third-Party Administrator." (*E.g.,* Ex. AA.)

## **LEGAL STANDARD**

Discovery sought must be both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see also Ala. Aircraft Indus., Inc. v. Boeing Co.,* No. 2:11-CV-3577-RDP, 2015 WL 13622487, at *2 (N.D. Ala. Jan. 26, 2015) (Proctor, J.) (denying a motion to compel discovery where request was unrelated to existing claims). That requires an assessment of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *See* Fed. R. Civ. P. 34(b)(1)(A).

"When discovery does not relate to the actual issues in the case, then it does not meet the relevance and proportionality requirements." *Runton ex rel. Adult Advoc. & Representation v. Brookdale Senior Living, Inc.*, No. 17-60664-CIV, 2018 WL 1083493, at *6 (S.D. Fla. Feb. 27, 2018). The court must "focus on the *actual claims and defenses involved in the action.*" *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 355 (11th Cir. 2012) (quoting Fed. R. Civ. P. 26 Advisory Committee's Note) (emphasis added). "[T]he requirement of Rule 26(b)(1) that the

material sought in discovery be 'relevant' should be firmly applied . . . ." *Herbert v. Lando*, 441 U.S. 153, 177 (1979).

## **ARGUMENT**

Despite stating the opposite to Plaintiffs over a year ago, Defendants now contend that granular medical claims data is "highly relevant" and "necessary" to this case. They also assert—in contrast to their representations to Plaintiffs and this Court—that the burden associated with the production of claims data is "minimal" and that such discovery, in turn, is proportional to the needs of this case. Defendants are wrong. For the reasons set forth below (and for the reasons set forth in Plaintiffs' Motion for a Protective Order), the Motion should be denied.

The discovery Defendants seek is misaligned with the actual claims and defenses at issue here, and Defendants' Motion should be denied for this reason alone. In addition, Defendants already are receiving ample discovery concerning non-Blue pricing and competition (or lack thereof), for Plaintiffs' ASO business, rendering granular claims data not proportionate to the needs of the case. Finally, injecting non-Blue claims data into the litigation at this point will further derail the discovery schedule. Defendants' initial efforts to thwart this discovery, rather than assiduously pursue it, further supports denial of the Motion.

## I.    **Defendants' Belated Claims of Relevance and Necessity Are Not Tethered to Plaintiffs' Actual Claims or Any Legitimate Defense**

Plaintiffs' claims are targeted at agreements between and among Defendants to not compete for National Accounts, such as Plaintiffs. Defendants' agreements are *per se* unlawful, horizontal agreements in restraint of trade. Non-Blue insurers are not alleged to be part of Defendants' conspiracy. For this reason, "whether the Blues are in fact less expensive than their competitors" is beside the point. (*BBB* ECF 361 at 1.) The only relevant questions about "competition," "damages," and "antitrust injury" at issue here concern the prices charged by the

6

Blue Defendants (and their Green brands) when they compete *against each other*. The challenged scheme prevents Plaintiff National Accounts from receiving the benefits of competition among Defendants for Plaintiffs' ASO business.

Even if Defendants were correct that "the Blues negotiate larger discounts on amounts that Plaintiffs owe providers for services rendered," granular data demonstrating that proposition says nothing about Plaintiffs' actual injury or damages. Relative levels of provider pricing between Defendants and non-Blues are beside the point. What matters are the missing additional Blue bids that would result in reduced administrative fees and other incidental charges for Plaintiffs' health plans. The same is true for Defendants' anticipated analysis of "how quickly the Blues pay provider claims compared to their competitors[,]" or where Plaintiff members travel to receive their care. (*BBB* ECF 361 at 5-6.). That is a misdirection. The antitrust laws do not allow competitors to collude with each other and allocate customers simply because they believe they deliver certain quality features; that is not a legitimate antitrust defense and Defendants do not cite a single case suggesting that it is. *See, e.g., Nat'l Soc. of Pro. Engineers v. United States*, 435 U.S. 679, 694-695 (1978) ("The Society's affirmative defense confirms rather than refutes the anticompetitive purpose and effect of its agreement. . . . Petitioner's ban on competitive bidding prevents all customers from making price comparisons in the initial selection of an engineer, and imposes the Society's views of the costs and benefits of competition on the entire marketplace. . . [This] is nothing less than a frontal assault on the basic policy of the Sherman Act.")

Defendants also assert that they intend to "model the competitive effects that the additional competition that Plaintiffs allege would exist on the subscriber side of the proposed market in the but-for-world would have on members' provider choices and provider reimbursement rates." (*BBB* ECF 361 at 4.) There are several issues with this assertion.

7

First, Defendants' proposed modeling is not tethered to a legitimate defense. Defendants cite Third and Ninth Circuit case law to suggest they can challenge Plaintiffs' damages based upon the purported need to offset the claims based upon provider prices in the but for world. The law is clear that Defendants cannot offset antitrust harm caused to one set of victims by arguing that Defendants also caused harm to another set of victims that somehow benefited the first set of victims. *See, e.g., In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at \*15 (S.D.N.Y. Mar. 28, 2014) ("Apple's offset argument is rejected on several grounds. First, Apple is not entitled to reduce the amount of any damages that it owes because of any benefits that it claims consumers received when Apple entered the e-book market by selling e-books through its iBookstore."); *NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 116-17 (1984); *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 610 (1953); *U.S. v. Topco Assoc., Inc.*, 405 U.S. 596, 609-10 (1972). *L.A. Mem. Coliseum Comm'n v. Nat'l Football League* is an outlier case, involving a professional sports franchise who directly benefitted from a restraint that it was a party to. 791 F.2d 1356, 1367 (9th Cir. 1986) (finding district court error "when it excluded from the jury's consideration in calculating damages the benefits the Raiders realized by taking from the NFL the opportunity to establish an expansion franchise in Los Angeles"). *City of Pittsburgh v. W. Penn Power Comp.* does not address Defendants' offset argument and stands for the unremarkable proposition that a plaintiff must tether their damages claim to the challenged conduct. 147 F.3d 256, 268-69 (3d Cir. 1998) ("The other damages are precisely the type which cannot be directly connected to the alleged agreement. There is no way to determine whether the rates the City will pay for electric service are or will be affected by the alleged actions of Allegheny Power and Duquesne Light"). Plaintiffs do not seek damages in this case based upon actual

8

amounts paid to providers for services rendered to Plaintiff members, rendering Defendants' case law inapposite.

Second, it is impossible to reconcile Defendants' assertion with their decades-long defense of the provider class action in the MDL. Defendants have taken positions before this Court, tendered numerous expert reports, and caused a decades-worth of litigation that are all inconsistent with their purported relevance basis for the claims data. The Court should consider it accordingly.

Third, Defendants previously rejected the notion that granular medical claims data was necessary at all in this case. (*See BBB* ECF 359-3 at 2.) ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ To be sure, Defendants' expert reports are important discovery that rendered production of granular medical claims data unnecessary in this case. But Plaintiffs never argued (as Defendants assert) that the discoverability of non-Blue claims data hinged in any way upon the findings of Defendants' experts.

Finally, Defendants argue that "several courts—including Judge Putnam in the MDL—have addressed the discoverability of claims data in similar cases and compelled its production." (*BBB* ECF 361 at 6.) Plaintiffs already have explained why Defendants' reliance upon Judge Putnam's Order in the Provider case is unavailing here. (*BBB* ECF 359 at 10-11.) Additionally, Judge Putnam's Order undermines Defendants' claims of relevance and necessity: if non-Blue claims data is so "necessary," Defendants should have immediately sought such data from HCCI

here; the fact that they did not illustrates their claims of need are hollow.[2]  Defendants also cite an unpublished slip opinion from *In re Delta Dental Antitrust Litigation* for the proposition that courts routinely order production of claims data.  No. 19-CV-6734, slip op. at 3-11 (N.D. Ill. July 18, 2023), ECF No. 575.  That opinion does not explain how the data Defendants seek are relevant to defending against Plaintiffs' claims here.  The *Delta* court did not (as Defendants' parenthetical suggests) make a sweeping ruling that claims data were always relevant and necessary discovery concerning a but-for-world framework.  The only live "substantive" dispute related to third-party confidentiality concerns and whether data would be produced in a blind or non-blind manner.  *See id.* at 10.  Nothing about Judge Putnam's Order or *Delta Dental* makes non-Blue claims data pertinent to the claims or defenses here.

## II.    Defendants Already Have Proportionate Discovery Concerning Non-Blue Competition

Defendants assert that they "are entitled to discovery regarding the competitiveness of the market for ASO services, including to support their two-sided market defense, regardless of whether Plaintiffs may now disagree with the merits of that defense."  (*BBB* ECF 361 at 8.)  As an initial matter, Defendants' two-sided market defense is misplaced because this is a *per se* case[3], and, among other things, there are no simultaneous transactions as required under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018).  Defendants sell administrative services to National Accounts and typically bill for those monthly.  Although Defendants contract with providers to set prices for some services (while other services, such as out of network services, are address ex

---

[2] Defendants claim that "the production of granular non-Blue claims data is therefore highly relevant to evaluating the competitiveness of the market for ASO services as a whole," (*BBB* ECF 361 at 4), but in order to approach such analysis, Defendants would be seeking all non-Blue claims data—not just the data that non-party, non-Blue insurers may have for Plaintiffs.  (*BBB* ECF 361 at 10 n. 7.)  The limitation of non-Blue data to only data for Plaintiffs (let alone only the Plaintiffs who utilized non-Blue insurers) would necessarily render any analysis incomplete.

[3] *See In re Blue Cross Blue Shield Antitrust Litig.*, 2:13-cv-20000-RDP, Dkt. 2901 (Feb. 16, 2022)

ante), those transactions occur well before, or in the case of out of network services, well after, any medical service is rendered. Nothing happens simultaneously.

But even putting those defects aside, Plaintiffs are not foreclosing Defendants from any discovery they claim to need for their two-sided market defense or any other defense. The Motion shows that Defendants possess the discovery they need to proffer their (misplaced) defenses. Defendants assert that "Plaintiffs' own brokers' documents show that . . . Plaintiffs select the Blues because of Blue discounts on provider payments." (*BBB* ECF 361 at 3-4.) Defendants also cite Plaintiffs' agreements with non-Blues in support of their Motion. (*Id.* at 10-11.) Defendants have abundant discovery concerning non-Blue competition and pricing. The discovery that Plaintiffs already have provided and which they continue to provide renders Defendants' eleventh-hour claims of necessity untenable, and the production of granular claims data disproportionate to the needs of this case. *See Gremillion v. Stantec Consulting Servs. Inc.,* No. 3:23MC13-MCR-HTC, 2023 WL 4417266, at *5 (N.D. Fla. July 5, 2023) ("the Court cannot discern why Plaintiff needs every document even remotely related to every financial transaction between Entrix and BP or Entrix and other consultants. . . . Knowledge that BP was paying Entrix should be sufficient for Plaintiff to make her arguments regarding bias. ***The granular level of detail sought by the subpoena is simply not proportional to the needs of the case***." (emphasis added).)

## III.    Production of Non-Blue Claims Data Will Be Burdensome and Derail The Case

Defendants' prior representations to this Court, the Court-appointed Neutral, and Plaintiffs belie any suggestion that the burden and cost associated with the production of non-Blue claims data is "minimal." (*BBB* ECF 361 at 9.) This is not a situation where there are vague or conclusory assertions of burden. It is evidenced by the Plaintiffs' year-long dialogue with Defendants over claims data, and the fact that Defendants have not even produced their own claims data yet.

11

Defendants assert that Plaintiffs "who only contracted with Blues for ASO products during the 2015-2022 period . . . need not produce any claims data—Blue or Non-Blue." (*BBB* ECF 361 at 9.) Yet, these Plaintiffs are still required to endure the burden and delay associated with hosting such data—relevant or not. (Ex. V ¶ 3; Ex. AB ¶ 3.) Defendants contend that certain Plaintiffs who do not directly possess non-Blue data can simply direct their insurers to produce Plaintiffs' data on their behalf. Defendants assert that this amounts to "no burden." (*BBB* ECF 361 at 9.) The argument is irreconcilable with the entire discovery record here. Plaintiffs and Defendants spent months addressing the contours of Defendants' medical claims data production—with key questions concerning the meaning and significance of selected data fields still unanswered and calling for deposition testimony. (Ex. U.) Unlike Plaintiffs' prior request for MDL data, this is not simply a matter of picking up the phone and asking someone to "press send"—a task that even Defendants contended was unduly burdensome and costly. The litany of correspondence between the parties, and the hundreds of claims data fields being produced (and not produced) shows any attempt to identify the appropriate non-Blue claims data will be a massive and time-consuming undertaking. (*BBB* ECF 359-5; *id.* 359-19.) That undertaking will assuredly delay the resolution of the case and inject substantial additional discovery costs.

## IV. Plaintiffs Generally Do Not Have Access to Claims Data, And What They May Be Able To Obtain Is Limited

Defendants' Motion engages in a fiction: that Plaintiffs possess or have access to bulk structured datasets of the kind that Defendants will be producing in this case. That is not the case, providing yet another reason why Defendants' Motion should be denied: unless the non-Blue claims data that Plaintiffs supposedly can obtain is of similar breadth and detail to what Defendants intend to produce (three hundred-plus data fields), any comparative analysis of the data will be unreliable and incomplete.

12

Plaintiffs generally do not in the ordinary course of business have access to the data dictionaries and all of the data fields that non-Blue insurers maintain for Plaintiffs' claims data. (*See generally* Exs. V, AB.) Plaintiffs have repeatedly explained, Plaintiffs (in the instances where they have anything) generally have limited access and viewing rights for certain claims. (*See* Ex. V ¶¶ 4-7; Ex. AB ¶¶ 4-8.) They do not have access to comprehensive datasets or the breadth of data fields that non-Blues maintain concerning, for example, actual amounts paid to providers for services rendered, or claim adjustment timeline. (*See* Ex. V ¶¶ 4-7; Ex. AB ¶¶ 4-8.) Defendants' reliance upon general maxims concerning a party's obligation to obtain and produce information that it has the practical ability to acquire or obtain do not fit with this case, nor do they align with the purported modeling Defendants intend to undertake. It is not sufficient for any credible analysis or modeling for Plaintiffs to simply obtain "some" claims data. Defendants intend to produce three-hundred (of more than five hundred plus) data fields for their own Blue claims data. (*BBB* ECF 359-19.) Insurers like Aetna and Cigna assumably have similar robust data repositories that will need to be investigated and explored. Securing the production of potentially usable non-Blue claims data requires more than simply giving a directive. The parties' long history discussing the production of Blue claims data fields proves this.

In an attempt to demonstrate Plaintiffs' supposed access to non-Blue granular claims data, Defendants cite a Burlington Northern contract ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



In sum, even assuming that a Plaintiff may possess, or have limited rights to access some claims data from non-Blues, understanding and ascertaining the completeness and sufficiency of even that sliver of piecemeal data will be a complex and burdensome undertaking—not a matter of a Plaintiff simply snapping their fingers and giving a directive.[4]

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court deny Defendants' Motion to Compel and issue an order protecting Plaintiffs (and any third-party insurers who possess the claims data) from any of Defendants' discovery requests that call for any Plaintiff to produce, or undertake any steps to facilitate the production of, comprehensive individual medical claims datasets where Plaintiffs utilized a non-Blue insurer for its health plan.

Dated: August 30, 2024

Respectfully submitted,

By: */s/ Benjamin T. Presley*
Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
Starnes Davis Florie LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Tel: (205) 868-6000

---

[4] Defendants cite unspecified discussions with non-Blue insurers concerning the potential production of Plaintiffs' claims data. Defendants first revealed such discussions in correspondence submitted to the Court-appointed Neutral on May 30, 2024. Plaintiffs previously asked to participate in all such discussions, but Defendants apparently conducted such discussions outside Plaintiffs' presence. In any case, because the data are not relevant or proportional to the needs of this case there is no basis for the Court to order Plaintiffs to "direct the non-Blue healthcare plans they contracted with to produce their members' claims data files."

2983314.1

Email: jezelle@starneslaw.com
   twells@starneslaw.com
   bpresley@starneslaw.com

*Counsel for all Plaintiffs in the Alaska Air and JetBlue cases.*


By: */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, LLC
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Email: pes@sperling-law.com
   jvanek@sperling-law.com
   dgermaine@sperling-law.com
   ekelly@sperling-law.com

By*: /s/ Phillip F. Cramer*
Phillip F. Cramer
SPERLING & SLATER, LLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37203
(312) 641-3200
Fax: (312) 641-6492
Email: pcramer@sperling-law.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, and North Central States Regional Council of Carpenters' Health Fund*

*Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan*

15

*for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; Kellogg Company Retiree Welfare Benefit Plan; The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; North Central States Regional Council of Carpenters' Health Fund; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters' Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund;*

16

*Heartland Health & Wellness Fund;
GuideStone Financial Resources;
GuideStone group Plan; GuideStone
Personal Plan; Church Pension Group
Services Corporation; General Board of
Pension and Health Benefits of the United
Methodist Church; Concordia Plan
Services; Concordia Health Plan; Portico
Benefits Services (the Evangelical
Lutheran Church in America's benefit
board); Christian Brothers Services (a
church plan benefits board created by the
Christian Brothers religious order);
Christian Brothers Employee Benefit
Trust; The Board of Pensions of the
Presbyterian Church U.S.A.; The Benefits
Plan of the Presbyterian Church (U.S.A.);
Employee Benefits Plan of MBM
Corporation; and the MBM Corporation*

By: /s/ J. Scott Hickman
J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT &
HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email: shickman@srvhlaw.com
         eosborne@srvhlaw.com

*Counsel for The Kraft Heinz Company,
Kraft Heinz Group Benefits Plan, Kraft
Heinz Retiree Group Benefits Plan, and
North Central States Regional Council of
Carpenters' Health Fund*

*Counsel for The Boeing Company;
Employee Benefits Plan Committee of The
Boeing Company, as the plan
administrator and named fiduciary of The
Boeing Company Master Welfare Benefit
Plan; Bridgestone Americas, Inc.;
Bridgestone Americas, Inc. Employee
Group Insurance Plan; Bridgestone*

17

*Americas, Inc. Retiree Medical Plan;
CHS/Community Health Systems Inc.,
sponsor and administrator of the
Community Health Systems Group Health
Plan; Dollar General Corporation;
Dollar General Health Plan (a component
of the Dollar General Corporation
Employee Benefits Plan); The Federal
Express Corporation; FedEx Freight,
Inc.; The Federal Express Corporation
Group Health Plan; The FedEx
Corporation Group Health Plan; FedEx
Corporation Retiree Group Health Plan;
The Federal Express Corporation Retiree
Group Health Plan; The Federal Express
Corporation Group Health Plan for
Pilots; The Federal Express Corporation
Retiree Group Health Plan for Pilots;
FedEx Group Health Plan; Tractor
Supply Company; Tractor Supply Medical
Plan*

By: */s/ Jason A. Zweig*
Jason A. Zweig
BARTKO LLP
1 South Wacker Drive
36th Floor
Chicago, IL 60606
Email: jzweig@bartkolaw.com

*Counsel for JetBlue Airways Corporation
and JetBlue Airways Group Health
Insurance Plan, McLane Foodservice
Distribution, Inc., and Employee Benefits
Plan of MBM Corporation*

*Counsel for Alaska Airlines, Inc.; Alaska
Airlines, Inc. Welfare Benefit Plan;
Alaska Air Group, Inc.; Alaska Air
Group, Inc. Welfare Benefit Plan;
Horizon Air Industries, Inc.; Horizon Air
Industries, Inc. Welfare Benefit Plan;
Employee Benefit Plan for Employees of
Horizon Air Industries, Inc.; Employee
Benefit Plan for Full-Time and Part-Time*

18

*Employees Horizon Air Industries, Inc.;
American Electric Power Service
Corporation; American Electric Power
System Comprehensive Medical Plan; Big
Lots, Inc.; Big Lots Associate Benefit
Plan; Burlington Northern Santa Fe LLC
(f/k/a Burlington Northern Santa Fe
Corp.); Burlington Northern Santa Fe
Corporation Group Benefits Plan;
Burlington Northern Santa Fe
Corporation Welfare Benefit Trust; FedEx
Corporation; The Federal Express
Corporation; FedEx Freight, Inc.; The
Federal Express Corporation Group
Health Plan; The FedEx Corporation
Group Health Plan; FedEx Corporation
Retiree Group Health Plan; The Federal
Express Corporation Retiree Group
Health Plan; The Federal Express
Corporation Group Health Plan for
Pilots; The Federal Express Corporation
Retiree Group Health Plan for Pilots;
FedEx Group Health Plan; McLane
Company, Inc.; McLane Company, Inc.
Welfare Plan; Employee Benefits Plan of
MBM Corporation; and the MBM
Corporation*


*/s/ William J. Blechman*
William J. Blechman
Joshua B. Gray
Elizabeth B. Honkonen
Kenny Nachwalter, P.A.
Four Seasons Tower - Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email: wjb@knpa.com
        jgray@knpa.com
        ebh@knpa.com

*Counsel for US Foods, Inc.*

19

*Counsel for Albertsons Companies Inc.;
New Albertsons L.P.; Albertson's LLC;
New Albertson's Inc.; Safeway Inc.;
Albertsons Companies, Inc. Health and
Welfare Plan, f/k/a Albertson's LLC
Health & Welfare Plan; New Albertson's
Inc. Health and Welfare Plan; Hy-Vee
Inc.; Hy-Vee and Affiliates Benefit Plan
and Trust; The Kroger Co.; 84.51 LLC;
Murray's Cheese LLC; The Kroger Co.
Health and Welfare Benefit Plan; 84.51
LLC Health & Welfare Plan; Walgreen
Co.; US Foods Holding Corporation; US
Foods, Inc.; US Foods Health & Welfare
Plan; Walgreen Health and Welfare Plan
(Plan No. 501) f/k/a Walgreen Major
Medical Expense Plan*

*/s/ Jon Corey*
Jon Corey
MCKOOL SMITH, PC
1999 K Street, NW
Suite 600
Washington, DC 20006

John Briody
James Smith
David Schiefelbein
Daniel Hendler
MCKOOL SMITH, PC
301 Avenue of the Americas
32nd Floor
New York, NY 10019
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com
dschiefelbein@mckoolsmith.com
dhendler@mckoolsmith.com

Lew LeClair
Gary Cruciani
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000

20

Email: lleclair@mckoolsmith.com
gcruciani@mckoolsmith.com

Brenton K. Morris
BENTON, CENTENO & MORRIS, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
(205)-278-8000
Email: bmorris@bcattys.com

*Counsel for Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc.; Automobile Club of Southern California; Darling Ingredients Inc.; Griffin Industries, LLC; Dillard's, Inc.; Halliburton Energy Services, Inc.; G4S Secure Solutions (USA), Inc.; Kimberly-Clark Corporation; Lincoln National Corporation; Nestlé USA, Inc.; Perdue Farms Inc.; Pacific Gas and Electric Company; PG&E Corporation; RTX Corporation; Raytheon Company; Rockwell Collins, Inc.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; Sterling Jewelers Inc.; Zale Corporation; Zale Delaware, Inc.; Starbucks Corporation; Tyson Foods, Inc.; SRZ Liquidating Trust; Transform Midco LLC; and General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 30th day of August, 2024, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all Counsel of record.

By: */s/ Benjamin T. Presley*
Benjamin T. Presley

21